## Lessee of John Nicholas, Joseph Crunckleton and John Sellers, executors of Edward Nicholas *against* William Holliday and John Holliday.

A warrant issued without money paid, and an inofficial survey thereon, permitted to be read in evidence.

An application for a warrant in 1763 will not authorize a survey, nor can a warrant, directed to one deputy surveyor, be executed by another, without his authority.

A departure from the usual forms of the land office, affords grounds of suspicion.

The lines of a survey may be extended before it is returned, where no injury is done to other claimants.

EJECTMENT for 200 acres of land in Frankstown township.

The plaintiff claimed under a warrant to Edward Nicholas for 150 acres, including his improvement, about one and a half miles from the forks of Frankstown Branch, in Cumberland county, dated the 6th September 1762, on which 7l. 10s. was paid into the office of the receiver general, and a survey thereon of 199 acres and 17 perches, made 25th May 1765, by Samuel Finlay, who acted under Richard Tea, the surveyor of the district. Finlay surveyed four other warrants at the same time, amounting in the whole to 1100 acres, but having included only 550 acres, he in the month of July following extended the lines of the different surveys in his drafts, by order of Tea, who made pretensions to the adjoining lands. Edward Nicholas, by his will, directed that his lands on Juniata should be sold and the money divided amongst his children.

The defendants set up a defence under the copy of an application entered in the land office in warrant book T, on 3d March 1763, in the name of James Haldane for 300 acres, on the south side of the middle fork of Frankstown township branch, including a dry draft above the hill, which closes in and stops the passage on that side of the creek in Cumberland county; also on a like application entered on the same day, in the name of Timothy M'Kinley, for 300 acres, (described as above,) about one and a half miles above the draft.

Two warrants appeared to have issued on the same 3d March 1763, to Haldane and M'Kinley, describing the lands as in their respective applications. They were both directed to Thomas Smith, with the following indorsements signed by John Lukens, surveyor general. "It is supposed the land for which this "warrant was granted interferes with prior warrants. Execute "*this warrant on the land left out by prior warrants, [*400 "and make return into my office."

Copies of surveys made by Richard Tea, in pursuance of these

warrants, on the 18th May 1765, were offered to be read in evidence, the one for Haldane containing 301 acres, the other for M'Kinley, containing 287 acres, which appeared to have been returned into the surveyor general's office on the 7th March 1767.

These applications, warrants and surveys, were opposed as evidence by the plaintiff's counsel. As grounds of objection, they shewed a certificate from the surveyor general, that there were no warrants in his office to Haldane and M'Kinley, but that certified copies of the applications were filed therein as of the date of 14th July 1794; another certificate from the receiver general, that no money appeared to have been paid in his office either on the applications of Haldane or M'Kinley; also two surveys by Thomas Smith, made on the 2d December 1774, the one for Haldane containing 243 acres, and the other for M'Kinley, containing 243¾ acres.

They contended, that the application for a warrant was no authority to survey lands in 1763. The papers produced were mere copies from the warrant book, and it is well known, that the introduction of locations or applications as grounds of surveys, did not obtain until August 1766 in the proprietary land office.

The warrants must have issued fraudulently or improvidently. No warrants ever issued without money being previously paid, or without reciting a consideration as services performed, &c. But granting to these warrants a degree of validity, to which they are not entitled, what authority had Richard Tea to execute them? He could not legally act without a deputation. But they are specially directed to Thomas Smith, and he is interdicted expressly from surveying any lands which might interfere with prior warrants, which he certainly would not have done if he had known the true state of the facts. The very execution of the warrants by Mr. Smith was an abandonment of the former surveys, supposed to have been made by Tea. They were not warrants of re-survey. To afford a feeble prop to the inofficial surveys of Tea, copies of the applications are surreptitiously thrust into the surveyor general's office as of July 1794.

BY THE COURT. The papers offered come before the court in a very questionable guise, and wear a suspicious appearance. But let them be read, as was done last Circuit Court at Bedford, *401] *in Dougherty's lessee *v.* Piper, in a case resembling the present. We will judge of their legal operation, and facts will arise on them, of which the jury are the constitutional judges.

It appeared in the course of the trial, that Haldane and M'Kinley had in June 1764, conveyed their respective warrants to John Litle and Richard Tea, in consideration of 5l., and that the defendant, William Holliday, on the 25th April 1774, had entered into an agreement for 500 acres, part thereof at 20s. per acre.

[Nicholas' Lessee *v.* Holliday.]

After the cause had been fully argued by Messrs. Duncan and Walker for the plaintiff, and Messrs. Hamilton and Watts for the defendants, the court charged the jury, that it was obvious the application for a warrant in 1763, before the system of locations was adopted, did not authorize a survey. Neither could a warrant, directed to Mr. Smith, justify a survey and return by Tea, unless by the authority of the former. The act was inofficial. It is true, the late proprietaries might bind themselves by warrants issued in a new mode, but this departure from the usual forms of their land office must be shewn to have been intentional, by strong and cogent proof, otherwise the transaction would certainly give just cause of suspicion of unfair practice. And it is clear, that the proprietary officers could not by such unusual procedure, devest or affect the interests of grantees claiming under prior rights, who had paid their money in confidence of such contract.

With respect to the extension of the lines of a survey, the practice had been for surveyors to run and mark the boundaries on the ground, and afterwards calculate their contents. They could then add to or diminish the quantities surveyed on the closing lines. But if any great mistake had been made, careful surveyors usually went on the ground again and made new surveys, obliterating their former marks. After a survey was returned into the surveyor general's office, the lines could not be extended without a new warrant or order of survey, their former authority being *functus officio.* But before such return, the surveyors might extend the lines of a survey made by mistake, where no injury resulted to other claimants. Here the mistake was made by the agent of Tea himself, who surveyed only one half of the quantity of the lands called for by the warrant; the lines were extended by his direction, who claimed the lands thereby included. *Quilibet potest renunciare juri pro se introducto.*

Verdict for the plaintiff.

Explained in 4 Yeates 217.

Cited in 3 S. & R. 350 to show that after a survey returned, no new survey nor the extension of the lines of an old survey, can be made, without a new warrant, or order of survey; the former authority being *functus officio.* Cited for the same purpose in 4 S. & R. 295; 5 S. & R. 188, and 7 Pa. 72; 4 Watts 445.

Cited on the practice of receiving receipts in evidence in 5 Watts 219.

Referred to in 1 Watts 528, where the same land seems to have been in controversy.