# Goddard *against* Gloninger.

The receipt of one who had been a chief clerk in the land office many years before, for the purchase-money of land, may be read in evidence in an action of ejectment for the same land, upon proof of the hand writing by a witness who knew it no otherwise than from knowledge derived in the office where the clerk was.

A title to land may be established by evidence contained in the books and among the papers of the land office, although no warrant for the land can be found.

A survey, made by a deputy before the lines of his district were run, of land reputed to be in his district, will not be considered void forty years afterwards, when it is discovered, by more careful examination, that there was a mistake as to the lines of the district.

If a survey be returned, and the title otherwise appear in the land office to be regular, and has been so for more than twenty-one years, it ought not to be easily disturbed, especially in the hands of one who purchased upon the faith of that appearance.

If a warrantee delays unreasonably in procuring his surveys to be made and returned, and an intervening right occur, it is the duty of the court to tell the jury that such unreasonable delay ought to postpone the party.

Testimony of the officers of the land office as to the usages and practice in doing the business of the office, is often competent evidence in an ejectment depending upon the validity of the original title.

ERROR to the common pleas of *Lebanon* county.

This was an action of ejectment by John Gloninger, Martin Meily

v.—2 b

and John Bickel, Sen., against John Goddard, Charles Bird, Joseph M'Eldridge, Benjamin Kugler and John Beck & Co., for four tracts of land in Lebanon county.

The plaintiff gave in evidence two warrants dated the 8th of April 1794, under which they claimed, and then offered a survey for the warrantees, made by John Weidman, deputy-sheriff, on the south side of the Second Blue mountain in East Hanover township, Dauphin county, dated the 12th of August 1796, endorsed "transferred from rejected to accepted files by order of the board of property of the 4th of August 1830, in pursuance of the order of the 4th of February 1829." To which offer defendant's counsel objected, because John Weidman was not appointed a deputy-surveyor for the district of country in which said surveys are located, and because they are rejected and not accepted surveys. Which objections the court overruled and admitted the evidence to which defendant's counsel excepted.

Survey and endorsements read.

Plaintiffs further offer:

Receipt of John Keble 7 pounds 10 shillings, purchase-money, dated the 30th of July, 1794.

Richard T. Leech. (Shown above stated receipt.) I was formerly surveyor-general. I have seen often receipts signed by John Keble, brought to surveyor-general's office with title papers for purchase-money for land, when title papers brought in order to procuring patents.—John Keble, I have heard, was a clerk in receiver general's office. Those receipts signed by same person, with this receipt, I believe. I never saw John Keble write. To the admission of which receipt defendant's counsel objected, because not legally proved, witness never having seen John Keble write, nor ever knew him to be a clerk in receiver-general's office, which objections the court overruled and admitted the receipt to be read to which admission defendant's counsel excepted.

Plaintiffs then offered application of John Gloninger, Jacob Meily and Henry Thomas, dated the 3d of September, entered the 6th of September 1792, No. 9845, for four hundred acres in East Hanover township, Dauphin county, on Third and Fourth mountains, including the head waters of Second run, running through gap of Third mountain, and running into west branch of Shaeffer's mill creek, and a run of water which empties itself into Cold Spring creek, together with certified copy of old purchase-voucher, No. 9845, certified copy of warrant book, entry in it No. 13, showing entry of warrant dated the 6th of September 1792, for John Gloninger, Jacob Meily and Henry Thomas, 400 acres as above described by surveyor-general, as filed in his office in lieu of warrant, offered to show warrant issued marked "A," to which offer defendant's counsel objected, that it was not evidence *per se* that warrant issued, and no evidence given to show due diligence in searching for warrant;

which objections the court overruled and admitted the evidence, to which admission defendant's counsel excepted.

Plaintiffs then offered survey thereon, dated the 11th of August 1796, of four hundred and sixteen acres and seventy perches, between Third and Fourth Blue mountains, on east branch of Cold Spring creek, in East Hanover township, Dauphin county, with the same endorsements as on survey in first bill—to which defendants objected for the reasons assigned in their first bill, which exceptions the court overruled, and admitted the evidence, to which defendant's counsel excepted.

Certified copy of old purchase-blotter No. 4, No. 9485, showing payment by M. Dubbs of 10 pounds on above application, with deposition of M. Dubbs that he paid it for John Gloninger.

Receipt of John Weidman, dated the 16th of October 1809, for surveying fees to Martin Meily, executor of Jacob Meily, and account for surveying four tracts, 9 pounds, 8 shillings and 9 pence, on order dated May 1802.

24th of November 1802.　Will of Jacob Meily.

4th of October 1806.　Agreement of Martin Meily, Abraham Seabold and Anna his wife, Magdalena Gettle and Jacob Meily.

25th of November 1806.　Deed of Jacob Meily and wife to Martin Meily, Magdalena Gettle and Abraham Seabold.

12th of November 1824.　Will of Magdalena Gettle.

28th of December 1829.　Deed of Peter Gettle to Martin Meily.

31st of December 1829.　Deed of Abraham Seabold and wife to Martin Meily.

11th of April 1799.　Deed of Jacob Gettle and wife to Henry and John Mess, and John Spitler.

8th of February 1802.　Deed of Henry and John Meas, and Henry Spitler to Abraham Strohm.

21st of July 1804.　Deed of Abraham Strohm and wife to John Bickel.

Jacob Weidel, Esq.　I found these papers, field notes, among the deputy-surveyor's papers of John Weidman, in possession of Jacob B. Weidman, or in my possession as his manager at the forge, the residence of John Weidman, where he lived till his death.　They were at the same place when John Weidman died ; in his office were many of his papers belonging to deputy surveyor's office.　I have seen John Weidman write, am well acquainted with his hand writing, and should judge these his handwriting.

Field notes, page 263, John Gloninger, Jacob Gettle and Jacob Meily, three hundred acres; page 264, 10th of August 1796, Jacob Gettle and Jacob Meily, four hundred and fifty-four acres and fifty-six perches; page 265, John Gloninger, Jacob Meily and Henry Thomas; page 266, John Gloninger, Jacob Meily and Jacob Gettle, three hundred and four acres and eighteen perches.

Henry Peffer, Esq.　I am clerk of commissioners of Dauphin county.　I have here all the return duplicates and appeal duplicates

[Goddard v. Gloninger.]

from 1785 to 1813 both inclusive, that I could find for East Hanover township, no evidence in office of payment or non-payment, no return made to office unless paid, first sale of unseated land in Dauphin county in 1824.   There is evidence in commissioner's office of taxes on unseated land not being paid in Dauphin county; no evidence of payment.

Abstract from tax lists produced by witness, marked " B," agreed to be used as abstract of tax lists.

John Gossert.   I was assessor of East Hanover township in 1806, Dauphin county.   I assessed land for Gloninger, Meily and Kettle; they lay over the mountains, adjoining the Cold Spring; more than one tract.   I was collector of tax for that township from 1805 to 1808 inclusive.   I received the tax for these lands from Meily, Gloninger and Gettle for those years.   Henry Shewey was collector after me.   He is dead.   Christian Shewey, after Henry Shewey, was collector.

Cross-examined.   I got the names of owners sent from Harrisburg, and took the number of acres from the neighbours, and old duplicates; was on some of the lands; on Meily and            land; knew it; people told me; this was before I was collector.   Gloninger, Meily and Gettle never gave me any return of the lands.   Martin was assessor from 1805 to 1808, and I collected tax.   I was assessor in 1811; not first time; cannot tell the year I was assessor before.   I gave receipts for the taxes, when paid to me.   Mathias Henning, collector.   Mathias Henning is dead.   John Martin moved to Miami; heard he is dead.   I am seventy-five years old; have lived in East Hanover township forty-two years.

" After the evidence given, the plaintiffs offer to prove, by the witness, that the lands specified in their statement, and for which this action was brought, was formerly in East Hanover township, Dauphin county, and now and before the institution of this action are in East Hanover township, Lebanon county."   To which offer and evidence defendant's counsel then and there objected, that it is irrelevant, at this state of the cause; that it is secondary evidence; that the plaintiffs ought to produce the record of the court of quarter sessions, dividing the townships, or show that such record did not exist, or could not be found; which objections the court overruled, and admitted the parol evidence of the witness; to which admission the defendant's counsel did except.

Commission of John Weidman, by Daniel Brodhead, S. G., dated the 10th of September 1791, as deputy-surveyor of East Hanover, Lebanon, Bethel and Heidelburg townships, Dauphin county, read.

The plaintiffs then gave evidence of the surveys having been actually made, of the land in controversy.

Defendants, to maintain the issue on their part, offer a certificate, in lieu of warrant, to Peter Nagle, dated the 3d of April 1794, survey thereon dated the 30th of June 1795, for three hundred and eighty-

[Goddard v. Gloninger.]

three acres, forty-four perches, adjoining land of Valentine Koon and Gabriel Hiester.

Returned 9th of October 1806, and accepted same day: "Situate in Middle Paxton township, Dauphin county, containing three hundred and eighty-three acres, forty-four perches, and allowance, surveyed on the 30th of June 1795, to Peter Nagle, on his warrant, dated the 3d of April 1794, by Bartram Galbraith, late deputy-surveyor, as appears by his draft of the same.

*Caveat* by G. Heister, the 9th of August 1830, for Goddard, Bird, Eldridge and Brick:

"John Goddard, Charles Bird, Joseph M. Eldridge, Benjamin Kugler and John Beck, Jun., in trust, &c. do hereby enter a *caveat* against patents issuing to Jacob Kettle, Jacob Meily and John Gloninger, on three surveys, made the 9th, 10th, and 12th of August 1796, on their warrants, respectively dated the 8th day of April 1794; and also against a patent issuing on a survey made the 11th day of August 1796, on a warrant granted to John Gloninger, Jacob Meily and Henry Thomas, dated the 6th day of September 1792, containing four hundred and sixteen acres, seventeen perches.

"Alleging that the above described surveys are located out of the bounds of the deputy-surveyor, who made and returned the same, and that the acts of assembly then in force were not in other respects complied with, and that the said Goddard, Bird, Eldridge, Kugler and Beck in trust, have obtained patents from the commonwealth for the same lands included in the above surveys, on warrants of an older date than the three first warrants that are hereby *caveated.*"

Decision of board of property thereon of 4th of October 1831, in favour of the plaintiffs, Goddard and others.

With parol proof that when warrant is not to be found in surveyor-general's office, a certificate, such as here offered, is filed, in lieu of the warrant in surveyor-general's office, and that in no case is such a certificate filed except when warrant is lost, and when lost, such certificate is obtained by the surveyor-general, and filed by his direction in his office, in lieu of the warrant, and that the warrant is always searched for by the surveyor-general, before he applies for and files a certificate in lieu of it, and that this certificate filed, is the only evidence of search for warrant, and that it cannot be found. To which offer and evidence plaintiff's counsel objected; that warrant must be produced, without which there is no authority to make survey; that here is no evidence of search for warrant, of its loss or of its existence. Which objections the court sustained, and rejected the evidence offered. To which rejection of the evidence defendant's counsel excepted.

Defendants then offered a warrant to Daniel Linebach, for four hundred acres, dated the 3d of April 1794; survey thereon of four hundred and fifty-four acres fifty-six perches, of 30th June 1795; returned and accepted the 9th of October 1806. Plaintiffs objected, &c.

[Goddard v. Gloninger.]

John Davies, Esq. (Shown a draft.) The handwriting in the body of the draft, and the signature and direction to D. Brodhead, and all the letters and figures around and in the plot, are the handwriting of Bartram Galbraith. This, among other papers, was handed to me whilst I was deputy-surveyor of Dauphin county, by the widow of John M'Kee, who was the deputy-surveyor of Dauphin county, who succeeded Bartram Galbraith. I think I know Bartram Galbraith's handwriting, from the frequency with which I have seen his handwriting in official papers in the office of the deputy-surveyor, and other papers.

Cross-examined. I did not know Bartram Galbraith; never saw him write. This paper was handed to me in 1830. I was then deputy-surveyor of Dauphin county, and heard there were a number of papers. Mr Wightman, now married to Mrs M'Kee, told me he had a large number of papers belonging to the deputy-surveyor's office. I went to his house, in the lower end of Duphin county; he was not at home; his wife handed me this paper, with others that belonged to the deputy-surveyor's office. I do not know the handwriting of the residue of the paper. It was said Bartram Galbraith died in 1805. Defendants then also offered the paper draft signed by Bartram Galbraith, with the official copy of the survey above offered. Plaintiffs objected, objections overruled, and plaintiffs excepted. Read.

Warrant to Michael Rapp, dated the 3d of April 1794, for four hundred acres, adjoining Conrad Feger and Frederick Rapp; survey thereon the 13th of August 1795, four hundred and thirty-four acres one hundred and two perches, by Bartram Galbraith; draft signed by Bartram Galbraith. Returned and accepted the 9th of October 1806, with same proof by John Davies as above. Read.

Warrant to Conrad Koon, for four hundred acres, adjoining Elizabeth Koon and Valentine Koon; survey thereon by Bartram Galbraith the 30th of June 1795, four hundred and sixteen acres seventy perches; 9th of October 1806 returned and accepted. Original draft by Bartram Galbraith, with same proof by J. Davies as above. Read.

The errors assigned were to the opinion of the court rejecting and admitting the evidence mentioned in the various *bills* of exceptions, and to the opinion of the court as follows.

9. The court erred in their charge to the jury, in leaving it as a doubtful fact for the jury to decide, " whether the lands in controversy were situated in East Hanover or Middle Paxton township, at the date of these applications and surveys," inasmuch as by the records of Middle Paxton and the several records of the other townships given in evidence, it was conclusively established that they were in Middle Paxton, and so the court ought to have instructed the jury.

10. The court erred in instructing the jury, that " if these lands, at the date of application, and surveys in question, were situated in East Hanover township, and consequently within the district of John

[Goddard v. Gloninger.]

Weidman; then the surveys made by Bartram Galbraith, out of his district, gave no title till those surveys were returned and accepted, and if in the mean time the plaintiffs procured their surveys to be made by the proper deputy, they would gain a preference," inasmuch as that preference, if they ever had any, was lost by the plaintiffs suffering their survey to remain on the rejected files of the surveyor-general's office, for a period of near twenty-nine years, without any attempt being made or steps taken by them to have them accepted by the surveyor-general, a period of nearly thirty years having elapsed before they were accepted, under the doubtful circumstances attendant upon the acceptance.

11. The court erred in leaving it to the jury, as a matter of fact, " whether the presumption of the surveys in this case being duly made, was disproved;" the return and acceptance of those surveys in 1806, when taken in connection with the lapse of time that they remained uncontroverted, being conclusive of the rights of the defendants under them, no presumption did or could arise to defeat that right, or that they were not actually and legally made by the proper deputy on the grounds.

12. The court erred in stating the law as applicable to this case to be, " that if these lands were surveyed by Bartram Galbraith within his own district, for defendants, or those under whom they claim, the return of survey will be conclusive on the plaintiffs, that it was duly made, who claim by surveys made by a deputy-surveyor out of his district, in 1796, and not returned or accepted by the surveyor-general, till 1830," the return of defendants' surveys, and acceptance thereof, in 1806, a period of more than twenty-three years, before the acceptance of the plaintiffs' surveys, taken in connection with the record of the township lines of Middle Paxton, and the other records of the townships, given in evidence in the cause, being conclusive evidence that they were situated, at the date of those surveys, within the district of Bartram Galbraith, the court ought to have instructed the jury to that effect.

13. The court erred in leaving it to the jury to decide, from the evidence in the cause, whether the surveys of the defendants were situated in Middle Paxton or East Hanover townships, inasmuch as, if the records of the township of Middle Paxton, with the other records of the township lines, given in evidence in this cause (and covering all the territory of the then county of Dauphin, south of the dividing ridge,) did not conclusively establish the fact, that those surveys were made by the proper deputy-surveyor, within his proper district, but left the fact of the township lines doubtful; that doubt was not to operate to the prejudice of the defendants' surveys, but was cured and removed by the fact of these surveys being returned and excepted more than twenty-three years before the plaintiffs' surveys were accepted, and never controverted by them, or by any other person.

*J. A. Fisher*, for plaintiff in error.
*Weidman* and *Foster*, for defendant in error.

The opinion of the Court was delivered by
HUSTON, J.—Many things are presented, in this voluminous record, which to me had appeared long settled, yet are here made the subject of exception and of alleged doubt. When I came into the profession, in 1795, almost all causes in which the title to lands came in question, were removed to the supreme court, and, after the circuit court was established, into that court; and until 1809, when that court was abolished, all such causes were tried before, at first, two judges of the supreme court, and afterwards, before one judge. M'Kean, Shippen, Yeates and Smith, were the judges in 1795; after M'Kean was elected governor, Brackenridge came on the bench. These men were eminent, as general lawyers, and some of them had more experience of the local land title of Pennsylvania, than commonly falls to the lot of man. The three first named were at the bar or on the bench, each of them, above half a century.

At a period when no reports of decisions existed, this experience was a matter of some consequence. From some remaining cases, it appears Mr Chew, the chief justice for a few years before 1776, was a sound lawyer; but, it seems pretty certain that nothing, approaching very nearly to a regular system of law, as to land titles, existed, until the men I have just named, or three of them, composed the supreme court, on the adoption of the present constitution; and for several years it was gradually growing into regular and digested form, and, about 1795 it had begun to assume, and, in 1800 had assumed, its present shape. But there was no person reporting the decisions of the *nisi prius*, or circuit courts. A motion for a new trial, or, after the circuit court was established, an appeal, could be had only to the supreme court, which then sat only at Philadelphia, and very few cases were carried to the court in bank. In 1805 a western district was established, to sit at Pittsburgh, and, in 1807 a middle district, at Sunbury, and then others. The counsel, for many years, took notes of the decisions; these were often cited, and the points settled were remembered more generally and more accurately than since it has become the fashion to take writs of error or appeals and to publish all the decisions. From 1807 until this time, some cases on land titles were carried to the supreme court by appeal, before 1809, and by writ of error after, but there are no detached points, and together, will not enable me to furnish a correct idea of the details, nor even of the general system.

At length, in 1817, Yeates's Reports appeared, but at that time almost all the suits arising from conflicting original titles, east of the Alleghany river, had been settled, and those volumes, although containing the only record of that part of our jurisprudence, have been neglected too much by the profession, while every scrap, from the often very loose and unsatisfactory *nisi prius* decisions of England,

[Goddard v. Gloninger.]

are sought for, and, too often, adopted; though often founded on usages of trade not known here, and often on acts of parliament unknown to us, and if known, essentially different from our own legislative provisions. These volumes lie neglected on the shelf, or in the office of the publisher, and yet contain more sound law on *general subjects of contest in this country*, than in the whole *nisi prius* reports of England, and are the only source of information, as to the details, and also of the general system of land titles in this state. To be sure, as the system was forming, some of the cases have been corrected, or overruled, and time has made some changes necessary; delay in completing a title might be excusable in 1800, and thirty-six years afterwards that delay may have been totally inexcusable. There are, however, in many parts of this state, mountains, for which these warrants were taken, and surveys thereon made and returned. These mountains were eagerly bought by a few individuals, and some of them sold and mortgaged, &c., &c.—the property and titles have laid long neglected—at length, many of them have become valuable for timber, and some for coal and other minerals, and we discover symptoms of contest, as to who has the best title to what, from 1800, for twenty or more years, was supposed to be worthless; and as we are compelled to compare the conflicting titles of the claimants, we must have recourse to the decisions made in cases in times past.

The act of the 9th of April 1781, established and organized the land office, under the commonwealth. By section one hundred and eleven of that act, it is provided, the secretary of the land office, receiver-general and surveyor-general, shall be entitled to receive such fees, from time to time, *as heretofore have been allowed by law*, until the same shall be altered by the legislature, and shall have power to appoint deputies or clerks to assist in executing the business of their respective offices, for whose conduct they shall be responsible, and copies of records, entries and papers of the said office, duly attested by them *or their lawful deputies*, under their hand and seal of office, shall be as good evidence as the original, by law, might or could be. The surveyor-general shall have power to appoint a deputy or deputies, in any county in this state, who shall have power to make and return into the land office, surveys of land only in the county for which such deputy shall be appointed, for the conduct of which deputy or deputies, the said surveyor-general shall be responsible.

This speaks of fees heretofore allowed, and the second section of the act of the 1st of April 1784, for granting lands, &c., says— The several officers of the land office are hereby fully enabled to do and perform every act and thing incident, or any wise appertaining to their said offices, with respect to receiving, filing and entering locations (applications) granting warrants on the same, receiving the consideration, *directing copies of warrants*, receiving returns and issuing patents of confirmation as heretofore, *agreeably to the former customs and usages of the land office.*

v.—2 c

[Goddard v. Gloninger.]

John Lukens, who had been surveyor-general under the proprie‾tors from 1761, was the surveyor-general under this act, till his death in 1789, and the routine and forms of the office (only substituting the commonwealth for the proprietor) continued pretty much as before. The bar and the judges, first named, knew that warrants, locations and applications, had been directed to the several deputy-surveyors, by the chief clerk for the time being, as officer, as by the surveyor-general himself, and until, in this case, I do not recollect to have heard it questioned that a receipt for purchase-money, signed by John Kible, who was long chief clerk of the receiver-general, or that a warrant directed to a deputy-surveyor by John Barron (who directed many thousand) or any other chief clerk of the surveyor-general, was not as good as if signed by the principal. A direction by a chief clerk is as valid as one by the principal surveyor-general. 2 *Serg. & Rawle* 561. But you must prove, it is said, that such a one was chief clerk at the time, and must prove the handwriting by some one who saw him write. Let us see to what this will lead us. First, to make the appointment out in the form required, you must show that the surveyor-general was himself acting under a commission; next that the governor who appointed him was duly elected; to reach that, you must at least prove the returns and the handwriting of all the return-judges, &c. &c.; thus, to read a warrant and return, you must have the signatures of some scores of men proved; that of the governor, of the surveyor-general, and of his clerk; and all this, when few men, and, in a very short time, no man can be found who ever saw one of them write, or who was born until after their death—and a title may be now, or soon will be, so old as to be good for nothing. This has not been, and cannot be, law. The acts of an officer, *de facto*, must in all ordinary cases pass the title of the state to him, to whom the usual documents show that it was granted; and the fact that a person signed the ordinary documents, must be *prima facie* evidence that he acted officially; subject, perhaps, in some cases, to be rebutted by proof to the contrary; when the matter in dispute is recent, and no *bona fide* transfer of property to a purchaser, who only could be governed by what appeared on the records.

Some doubts, however, were started, after almost all questions on original titles were settled, and on the 31st of March 1831, it was enacted, that copies of all records, documents and papers, in the office of the secretary of the commonwealth, secretary of the land office, surveyor-general, auditor-general, and state treasurer, when duly certified by the officers of said office, respectively, shall be received in evidence in the several courts of this commonwealth, in all cases where the original records, documents and papers would be admitted in evidence, &c. &c. Now, it is notorious, that one of the reasons, if not the principal one, for passing this law, was to give in evidence, extracts from the blotter or day book of John Kible,  who was chief clerk in the receiver-general's office, for the purpose

of showing when and by whom the purchase-money on warrants was paid; for, although he gave receipts to every one who asked for them, yet all did not ask for them, and many, perhaps most, of those given are lost.

In Dogherty's lessee *v.* Piper, 3 *Yeates* 290-1, we find defendant gave in evidence a warrant, &c., dated 1762, *a receipt for* 10 *pounds paid thereon.* This was a receipt of Edmund Physic, receiver-general. Lessee of Nicholas *v.* Holliday, 3 *Yeates* 399, plaintiff claimed under a warrant dated the 6th of September 1762, on which 7 pounds and 10 shillings were paid into the office; this, again, was a receipt of the receiver-general. Those causes were reviewed and I was one of the counsel in them; and my notes show this; and I have seen the receipts of Mr Physic and of John Kible given in evidence an hundred times, and no objection. The entry of money paid by either of those persons in the books of the land office, certified under seal, is evidence without proof of their handwriting. All our deeds are acknowledged or proved before judges, justices, or aldermen. The signature of these officers is never proved, nor their commissions called for. The fact of their acting as officers, is *prima facia* evidence that they were so; perhaps under certain circumstances liable to be disproved.

In this case, one of the warrants under which title was claimed could not be found in the surveyor-general's office, and a copy of an entry of the original application from the warrant book in the office of the secretary of the land office, had been sent to the surveyor-general's office in 1806, about the time patents were obtained. This, and the return of survey and patent were objected to, and also parol proof of the usage in the land office, to obtain a copy of such entry when a warrant is lost, and that it is never obtained until after careful search for the warrant and not finding it.

This matter is not new in this state. In the above cases of Dogherty *v.* Piper, 3 *Yeates* 290, and Nicholas *v.* Holliday, 3 *Yeates* 399, the warrants under which one party claimed were not found, and such transcripts were obtained; these and the surveys were objected to but received. The first case was compromised. Holliday's warrants were not to be found, and they had issued, as many others, about that time did, without the payment of any money. After being evicted, they brought ejectments; their warrants had some how got out of the proper place, and were found among some board of property papers, with a petition and minutes of a hearing before the board in 1774. At the subsequent trial, the fact that a great number of warrants had issued without payment of money from 1754 to 1764, was proved, and that no small portion of the best land in Bedford county was held by innocent purchasers, under such warrants, was made so apparent, and, also, that John Penn and the board of property, in his time, had recognised them, so as to justify the remarks afterwards made by C. Smith, vol. ii, 154, and this point in these cases ceased to be matter of contest, though the

causes were severally removed to the supreme court and opinions delivered—why not reported, I cannot tell. After many trials and contests, on every pretext, it was tried before Judge Reed, holding a special court and writ of error. This is reported in 12 *Serg. & Rawle* 140. There is nothing appearing about an objection to Holliday's warrant and surveys in that case. I admit a difference between the authority of the officers of the land office before and since the revolution; before they were the agents of the proprietors; and the mode and time of granting land varies so often and so suddenly, as to make it difficult to ascertain whether a particular variation was fraud, or accident, or design. The proprietor, or his subsequent officers, might, and often did, ratify what to us appears irregular, and where they have done so, in one instance, courts have done so in similar cases, and I have some reason to believe that in every case of those warrants issued from 1754 to 1764, without payment of purchase-money, the lands have been patented and the title is now at rest. But since 1781, the power of granting warrants, and the terms, are prescribed by positive law, and though the land officers are agents of the state, a title contrary to positive legislative enactments would not be ratified by their previous or subsequent approbation. Though, perhaps, lapse of time would, especially if accompanied by descents or sales, make even such valid.

It is, however, one thing to show that no warrant ever issued, and another and very different, to show that none can now be found in the surveyor-general's office. A case of the first kind I have not heard of under the state. It has often occurred that *none can be found*, and when we consider, for instance, that Northumberland county extended north to the state line and west to the Alleghany river; that Lycoming was taken off, and the papers divided to it; then Centre, and Bradford, and Tioga, and M'Kean, and Potter, and Jefferson, and Armstrong, and Clearfield, and a division of the papers, on each division of a county; when we consider how often all the papers have been removed from house to house; how very often each bundle has been opened and a paper taken out to be copied, and the possibility, that in returning it, it may be put into the wrong bundle, it is to be wondered at, not that some are displaced and thus, for a time, lost, but that this has not occurred more frequently. If an application has been made, the money paid, an entry of a warrant in the proper book, a return of survey stating that it was made in pursuance of a warrant, the title is good though no warrant can be found, much more if a patent has issued.

A much contested matter, in this case, arose on the point whether the surveys of the parties were made by the surveyor of the district, each alleging his own were made by the proper officer, and that the surveys of the opposite party were surveyed out of the district of the officer who made the surveys. The act of 1781, before cited, says, the surveyor-general shall appoint a deputy-surveyor in any county, who shall have power to make and return surveys, only in

[Goddard v. Gloninger.]

the county for which such deputy shall be appointed. In point of fact, more than one deputy-surveyor for each county has been appointed, and this was necessary when all the land on the west of the Susquehanna and on its branches, was embraced in six, or seven counties. The division lines of these districts were a stream of water, the lines of townships, or a line to run a certain specified course, and the townships were often unmarked until all the vacant land was surveyed; and where two districts were divided by a line of a certain course, e. g. a north and south line, I do not know a single instance in which it was run and marked, except within the last purchase of 1784. In that part of the state the first duty of a deputy surveyor was to run and mark the lines of his district, and by the fifteenth section of the act of the 8th of April 1785, every survey made by any deputy-surveyor out of his proper district, shall be void and of no effect. It was, however, decided as early as 1793, Wright *v.* Wells, 1 *Yeates* 286, by M'Kean and Yeates, that this law of 1785 related solely to lands within the purchase of 1784, and, in that case, the plaintiff recovered on a survey and return alleged to be made by a deputy-surveyor out of his proper district. The land had been patented on that survey. This decision has been recognised by the supreme court; see Harris and Marks, 2 *Serg. & Rawle* 560; Creek *v.* Moore, 7 *Serg. & Rawle* 331. The point has occurred in many other cases, and surveys made and returned by persons, who never had commissions as deputy surveyors, have been received in evidence; see Shields and Buchanan, 2 *Yeates* 219; Funston and M'Mahon, *Ibid.* 245. I should suppose this was on the idea that the surveyor-general had given a special deputation which was lost, and that his receiving the return was evidence that he had given such special deputation. To make a warrant and survey void by reason that the deputy has gone out of his district, the proof that the survey is out of his district must be clear. This is easy in the latest purchase where the lines were run and marked, but difficult in other parts of the state, and in some cases it is not possible to say where the line would have run. In this case, parol evidence, and assessment lists, and collector's receipts, were given in evidence to show that at one time the lands in question were considered to lie in the townships included in Wiedman's district; on the other hand the defendants produced the records of the court by which these townships were laid off, and by these it would seem the lands in question lay in Galbraith's district; but it does not appear to this court necessary to decide whether they were in the one or in the other; for where the lines of a district were not run when the survey was made, and by general reputation certain lands are in the district, a survey made and returned would hardly be considered void out of the purchase of 1784, though at the end of forty years some careful measurer should find there was a mistake as to where the line should have been run. So if a survey is made under such circumstances, and neglected more than thirty

years, and it turns out that a prior survey was made on the same ground on a prior warrant, and this is returned to the surveyor-general's office, and patented, and mortgaged, and sold, on the mortgages publicly, and since several times sold and paid for, it will not do to take away this title by reputation of where a line ought to have been. The fifth section of the act of the 5th of April 1782 says, it shall be lawful for the surveyor-general to receive returns of surveys made regularly and faithfully, from late deputy surveyors, their heirs and legal representatives, for such further period as to him shall appear just and reasonable.

And the act of the 4th of September 1793 says, all returns of surveys which have been actually executed since the 4th of July 1776, by deputy-surveyors, while they acted under legal appointments, shall be received into the land office, although the said deputies may happen not to be in office at the time of such return. These acts, though relating to former surveys, may be considered as indicative of legislative opinion. I admit that we find the expressions, in some cases, "if the owner has paid his money to the deputy-surveyor, he shall not be prejudiced by the neglect of the officer, to make the return." This may be true for a short time after a survey; it was going far enough to say so in suits brought in 1800, but it would be a misapplication of the rule to apply it to cases brought more than thirty years after the survey made. The office of surveyor-general is that to which all are bound to look, and do look, to ascertain if surveys are returned; and if a title appears regular there, and has appeared so more than twenty-one years, it ought not to be disturbed, especially in the hands of a purchaser, by ransacking the deeds of men, however respectable, who have not held the office of deputy-surveyor for more than a quarter of a century. The opinion of this court on this subject has been expressed in Mifflin *v.* Chambers, 1 *Penns. Rep.* 74; Star and Bradford, 2 *Ibid.* 395, and many other cases cited.

The act of the 3d of April 1792 has also, in section sixth, the provision, that a survey made by a deputy-surveyor out of his proper district shall be void and of no effect; but it has always been understood and adjudged, that that act, from section three to section ten, both included, relates solely to lands north and west of Ohio and Alleghany rivers. The provision in section four, that each deputy-surveyor shall keep a book and enter all warrants which come to his hands, and the name, dates and quantity, &c., has never been considered as applying to a deputy-surveyor in any of the purchases prior to that of 1784; and if Mr Weidman kept such a book I have not heard of any other deputy-surveyor out of that purchase who did so. If he did so, he was manifestly neglectful of his duty in not returning it as an official document to his successor. To the surveyor-general's office, or to that of the deputy-surveyor, persons are accustomed to look for information as to surveys. We have had this matter before us more than once; and I would say that where a

[Goddard v. Gloninger.]

title appears in the office of a surveyor-general fair and regular for twenty-one years, it should not be affected by field notes or drafts, whether found in the office of the deputy-surveyor or not; unless on a clear case of fraud, and where there was no change of parties by descent or sale. This by plain analogy to the statute of limitations as to lands. And where there has been a *bona fide* sale to an innocent purchaser, I would designate a much shorter period. Where a survey has been made and not returned, and no adverse claim, it may be returned yet, and give the title as against the state and all subsequent claimants. So, if the owner of a title has taken and kept actual possession, the survey may be returned and the title be good; but, I repeat, I would not hold an unreturned survey of any validity against an adverse warrant survey and return of more than twenty-one years standing, or against an actual settler of twenty-one years. It has, I admit, been in former times usual to give in evidence in ejectment, much of which turns out to be of no avail; and where a plaintiff is endeavouring to make out a title, all acts done by the proper officers respecting or affecting such title must go in evidence; but when the plaintiff has shown a regular office title of twenty-one years, it must be a case attended by uncommon circumstances which will justify admitting drafts of unreturned surveys to affect such title; and where a plaintiff has given such unreturned drafts in evidence, and the defendant shows a title founded on a warrant and survey, returned more than twenty-one years before suit brought, the court ought to tell the jury that the plaintiff must fail. Titles must, at some time, be settled; purchasers must, at some time, be safe. It has been often said, and truly said, that it must be left to a jury to decide whether the delay of a party in perfecting his title was reasonable or otherwise; but, I apprehend, this is correct only where the negligence is for a period short of twenty-one years; and there are not wanting cases from Lowing *v.* Gibson, 2 *Yeates* 81, to the present time, in which the court felt bound to say the neglect was so great that a plaintiff was barred. In Duncan *v.* Curry, 3 *Binn.* 14, Brackenridge, J. says it will not do for a party to say he did not know of the return of an adverse warrant. What is done by public officers, and recorded in a public office appointed for that purpose, must be considered as known to all persons. It is what the law calls constructive notice, and binds equally with actual; and in page twenty-one, Yeates, J. says, " instances may occur of such abandonment, wherein the court may feel no difficulty in stating to the jury that the gross delay and laches of a party are conclusive against him."

In this case the defendants have the first warrants, the first survey and the same neglect in procuring the return, yet returned in 1806. Plaintiffs did not pay the surveying fees until 1809, nor procure the return of survey to be filed until 1830. In the mean time the title of the defendants had passed through several purchasers and been pa-

[Goddard v. Gloninger.]

tented. The delay of the plaintiffs was unreasonable, and so the court ought to have told the jury; and that he could not recover.

And here this opinion might close, but some bills of exceptions may be noticed. I have shown that our acts of assembly direct the business to be done according to the usages of the land office. This relates to the routine and forms of the proceedings, not to the essentials of a title as prescribed by express law. And where the manner and form of the proceedings is objected to, there is no other way of deciding on it than by the evidence of those who know the usual forms. The testimony of Mr Leech as to those matters, and of Mr Washman as to another matter of practice or usage ought to have been received, and the court ought to have directed the jury as to the effect of such usage.

The offer of the minutes and order of the board of property, on the 4th of February 1829, which appear crossed on the minute book, and the testimony of Mr Crain and Leech respecting those proceedings are so immaterial that it is scarcely worth the time to notice them. It would have made no difference whether plaintiffs procured their surveys to have been returned at the end of thirty-three or thirty-four years. The one and the other was too great a delay ; but we have been accustomed to receive all orders of that board respecting titles contested in court. The order itself states that it was made on the statement (not on the oath) of a third person. The reason given why the returns were not accepted was a very strange one, for returns were uniformly accepted and filed, though the deputy-surveyor had not paid to the surveyor-general the fee due him on each return. The fact that this order was not sent to the surveyor-general's office, and that two crosses were drawn over it in the minute book of the board, were matters which could be only explained by parol ; and any person who could give any account of this strange proceeding ought to have been heard. It might have been well to send for Mr Dickinson, secretary of the *land-office* in 1829, but the other competent witnesses might tell what they knew.

After the defendants had given in evidence the warrants, surveys and returns of the separate tracts in dispute, the general draft of the whole of defendant's seventy-four tracts, brought from the office of the present deputy-surveyor, and admitted to be an office paper in the hand writing of Bartram Galbraith, the deputy-surveyor who executed defendant's warrants was evidence to show the location by title had been shown. It was rejected, I have no doubt, as useless, and because the court were wearied with offers and exceptions on minor points.

The answers to the fifth and sixth points proposed to the court are alleged as errors. The judge below seems to have laid more stress on the dispute, in whose district the land lay, *than in this case it deserved.* I have remarked on this already ; and on the sixth point, although strongly inclining against the plaintiff on account of his delay and negligence, he did not, as this court think he

[Goddard v. Gloninger.]

ought to have done, tell the jury the plaintiff's title was totally lost and destroyed by negligence greater than is recollected to have occurred in any reported case. And the answer to the tenth point seems to have again submitted the effect of this negligence to the jury. The case required an expression of the opinion of the court on this point.

Judgment reversed, and a *venire de novo* awarded.