# THE SUPREME COURT

OF

# PENNSYLVANIA.

WESTERN DISTRICT, SEPTEMBER TERM, 1847.

PITTSBURGH.

---

## VASTBINDER *v.* WAGER. (*a*)

Where the surveyor-general, under the provisions of the act of the 8th of April, 1785, laid off on paper the land contained in the new purchase, dividing the same into *sixteen districts*, and nominated to the executive council a deputy surveyor for each district, each of whom was approved, &c.; and where the interior of the said sixteen districts was a wilderness, without a single line, between the districts, run and marked on the ground,—all the lines and boundaries of the said districts being ideal and without a single call;—and where, under such circumstances, J., the deputy surveyor of one of the districts, located a warrant on land, which subsequently appeared not to be in his district, but in that of H., the deputy surveyor of one of the adjoining districts: it was *held*, that where the district lines were not originally run and designated on the ground, one could not now be made, which would disturb a survey more than sixty years old, and which was made and returned more than six years before the junior survey was made on the ground: and that such survey was not to be disturbed, by fixing by *parol* at this time a boundary between J. and H.'s districts.

A diagram of the sixteen districts, into which the land contained in the new purchase was laid off and divided on paper, by the surveyor-general, under the provisions of the act of the 8th of April, 1785, obtained from the office of the surveyor-general, *if an entire copy*, is evidence, in an action of ejectment for lands contained in any of said districts.

A certificate of the appointment of a deputy surveyor, under the act of the 8th of April, 1785, regularly obtained from the surveyor-general's office, is evidence.

In an action of ejectment, the tax-books and receipts for the payment of the taxes on the lands sought to be recovered are evidence.

IN error from the Common Pleas of Jefferson county.

*Oct.* 22, 1846. This was an action of ejectment to recover *five hundred and eighty-one acres and twenty-two perches* of land, in which, William Vastbinder, Andrew Vastbinder, Joseph Clements,

---

(*a*) This case was argued in October, 1846, and the opinion delivered at the last term.

John Wyncoop, William Steel, and Octavius Pickering, the plaintiffs in error, were defendants, and Peter Wager, the defendant in error, was plaintiff.

The facts of the case, so far as they are necessary to elucidate the points ruled here, are sufficiently stated in the opinion of this court.

On the trial in the court below, before McCALMONT, P. J., the plaintiff, for the purpose of showing that the survey of Pickering and company, under whom the defendants claimed, was void, offered in evidence a *diagram* of the districts of the deputy surveyors, in the new districts. This was objected to by the defendants, but admitted by the court. This was defendant's *first bill*. The paper book disclosed nothing more than what is stated above, in relation to the diagram offered in evidence.

The plaintiff then offered in evidence the certificate of the appointment of James Johnston, and others, as deputy surveyors. Objected to; and objection overruled by the court. This was defendant's *second bill*. The defendants offered in evidence certain tax books, and receipts for the payment of taxes on the lands in controversy, in the name of Pickering & Co., from the year 1810 until the year 1820. The plaintiff objected, and the court rejected the evidence offered. This was defendant's *third bill*. At the close of the evidence, each party propounded a number of points, on which, they requested the court to instruct the jury.

The answers of the court, however, to the second point of the plaintiff, and the fourth point of the defendant, each of which involve the same question, were only noticed by this court, and are stated in the opinion. This writ of error was sued out by the defendants below, who assigned for error, amongst others, the answers of the court to the second point of the plaintiff, and to the fourth point of the defendants, and also the admission and rejection of evidence as contained in defendant's three bills of exception.

*Jenks* and *Banks*, for plaintiff in error.—All evidence offered for the purpose of showing that Johnston, the deputy surveyor, in locating the warrants of defendants, acted without authority, should have been rejected. Johnston was an officer *de facto*, and therefore, as to third persons, was an officer *de jure ;* Riddle v. Bedford, 7 Serg. & Rawle, 392 ; Neal v. Overseers, 5 Watts, 538, 2 Rawle, 139. After the lapse of time, from the date of defendant's surveys, it is against the policy of the law to permit the regularity of those surveys to be inquired into; Norris v. Hamilton, 7 Watts, 91 ; Bellas

v. Levan, 4 Watts, 294; Neiman v. Ward, 1 Watts & Serg. 79. The extract from the rough draft should have been rejected; and also the certificate of the appointment of deputy surveyor. The draft does not correspond with the marks on the ground. It bears no date, and was never approved by the President and Vice-President in council; act of 1785, sec. 14; at best, but mere extracts, and whole record should have been given in evidence; Edmiston v. Schwartz, 12 Serg. & Rawle, 135. The tax books and receipts should have been received in evidence. They would have shown, that defendants always asserted and constantly maintained their right to the lands. They would have been evidence to leave to a jury, from which they might have presumed an ouster and abandonment of plaintiff's claim. Read v. Goodyear, 17 Serg. & Rawle, 350; Royer v. Benlow, 10 Serg. & Rawle, 306. The court erred in assuming as a matter of law, that plaintiff's survey embraced the lands in controversy. The fact was disputed, and the evidence contradictory, and should have been left to the jury.

The answers of the court to plaintiff's second and defendants' fourth point would be ruinous in their consequences, if held to be law. The titles to a large portion of the land in the new purchase would be unsettled. Lines between the 5th and 6th districts never run. The omission of the surveyor-general to define the districts in the new purchase, will not be allowed to prejudice the rights of warrantees. It was ruled in Goddard v. Glonninger, 5 Watts, 209, that where a survey is made before a district line is run, it is not to be affected by a subsequent survey of the line.

*Buffington* and *Drum*, for the defendant in error.—By the 12th section of the act of the 8th of April, 1785, the number and extent of the districts to be formed in the new purchase, were to be ascertained by the surveyor-general and president in council. By the 11th section, a deputy was to be appointed in each district, who was to take an oath and give bond. By the 3d section, every warrant was to be directed to the deputy of some one district to be surveyed; but if land to the satisfaction of the owner could not be found in that district, the deputy was to certify the said warrant to the deputy of some other district, in the presence of two witnesses, &c. The 15th section enacts as follows: "In making any survey by any deputy surveyor, he shall not go out of his proper district to perform the same; and every survey made by any deputy surveyor, without his proper district, shall be void and of none effect."

2 F 2

The Supreme Court has decided, in the case of Prout *v.* Bard, 10 Watts, 375, that if a deputy surveyor surveys the larger part of a warrant in his own district, but runs over into the adjoining one to take in the balance, the survey, so far as it is out of his district, is void. In that case, but part only of the survey was out of the district; in this case the whole was. But it is true in that case the district line was actually run and marked; where the survey was made in this case, the western line of Johnston's district, although run a number of miles, had not been extended so far as the land in controversy. The land, however, is ascertained and clearly proved to be outside of the boundary of Johnston's district. Whose duty was it to run that line, and to see that he confined his surveys within his jurisdiction? It was clearly the duty of the deputy Johnston. All that could be done by the surveyor-general and president in council, was to define on paper the "number and extent of the districts; the actual running of the lines on the ground was clearly to be the work of the surveyor himself, and it does not lie with him, or a warrantee who invokes *his services*, to say that he did not know the extent of his jurisdiction. He had a right and power to go to the extent prescribed by surveyor-general and council, but beyond that, in the language of the act of Assembly, his acts were " void and of none effect." If he transcended his jurisdiction ignorantly, his own neglect was the cause of his ignorance. But does ignorance of the extent of an officer's or agent's jurisdiction or powers give validity to that which is declared to be void? Is not a void act equally void, whether done ignorantly or wilfully? It is not the case of an irregularity that may be made good by a subsequent ratification, but of total invalidity, "it shall be void and of none effect," of utter want of authority, and is not susceptible of being ratified or confirmed. It resembles the case of an officer of inferior jurisdiction transcending his powers; and that has been uniformly and always declared since the foundation of the common law, to be *coram non judice*, without authority of law and void; and that, whether the extent of his power was well or ill defined, whether it had been settled by adjudication or not, or whether done mistakingly or unintentionally. The parties to the void proceedings of an officer are also equally affected, and if they attempt to enforce them, are trespassers. They are bound to know the extent of the jurisdiction of an officer whose services they invoke; 15 Johns. Rep. 156; 12 Johns. Rep. 266; 3 Cranch, 331; 11 Johns. Rep. 443; 1 Strang. 710; 1 Rawle, 403; 4 Watts & Serg. 20; 7 Watts, 545.

The policy of the law forbids all surveys and settlements on land which had not been purchased from the Indians, and they were declared void; 2 Yeates, 127; 5 Binn. 162; 6 Binn. 71, 73. The latter case is precisely in point, and decides that the fact of the boundary line of the purchase not being run, makes no difference. Chief Justice Tilghman says: "Equity would not require that he should have the identical land *illegally surveyed* in 1773, which has been *legally surveyed* and sold to another under the authority of the Commonwealth. This would be doing wanton injustice to the subsequent purchaser. In the present instance there has been no allegation of fraud; but there certainly was negligence or carelessness in the surveyor or the warrantee, or both. *The purchase line had not been actually run; it was therefore incumbent on the surveyor to keep at such a distance as should be clearly within it.* AT ANY RATE THE SURVEY WAS AT THE PERIL OF THE WARRANTEE." The case before the court is stronger than that, because in that case it was not the duty of the deputy surveyor to run the purchase: in this case, it was the duty of the deputy to run the district line. It cannot be said that the case in 6 Binn. is stronger than the present, from motives of public policy. The surveys in both cases are declared void; one by the policy of the law, and the other by the express enactments of the legislature. There are no degrees in invalidity; and it cannot be said that a survey made over the district line is *void,* and one made over the purchase line is *more void.* The simple question is, was the survey made out of the proper district of the deputy Johnston? If so, it was "void and of none effect;" whether done by ignorance, mistake, or design, and whether the line were run or not. The fact that the surveys were made out of the district was clearly proved, and not contradicted, was left as a fact to the jury, and was so found by them. Will this court declare, then, that the surveys of defendants below, thus out of the proper district, were valid?

But it is contended, that the subsequent acceptance of the surveys by the surveyor-general cured the defect, and made them valid. No subsequent ratification can make a void act valid and legal. Irregularities may be cured; but not that which is "void and of none effect." This argument cannot be answered better than in the language of Mr. Justice Rogers, in delivering the opinion of the court in the case of Barton *v.* Smith, 1 Rawle, 407: "The court are therefore of the opinion that the survey, being made without authority, is void; and that the receipt of the pur-

chase-money, and the acceptance of the survey, do not render valid the title of the plaintiffs."

*Sept.* 13, 1847. BURNSIDE, J.—This case has engaged our most careful investigation. Its importance to all the early surveys in the new purchase, led me to examine the minutes of the executive council, as well as the returns of surveys of the first deputies in that section of the state. The act of the 8th April, 1785, Dunlop, 107, opened the office for the sale of lands in the purchase of 1784, at £30 per hundred acres. The warrants were drawn and numbered, and the act prescribed how the owners should locate them, with the deputy surveyors, and how they should be surveyed and returned. The surveyor-general was directed to nominate to the executive council deputy surveyors; to direct the number of districts, and the extent and boundaries of each. The deputies were to be approved by the president or vice-president in council, who at their discretion might change and alter the districts; Dunlop, 110, sect. 12. On the 18th of April, 1785, the surveyor-general laid off on paper sixteen districts, and afterwards added two more. The Lycoming creek was the eastern boundary of the purchase. He nominated sixteen deputies, who were approved and commissioned by the executive council. The districts were laid off on paper by north and south lines, running from the west branch of the Susquehanna river, to the New York state line. They were each to have a south boundary of seven miles on the Susquehanna river, and the purchase line of 1768, running west from the cherry tree. The deputies were to ascertain their districts. The whole country then was a wilderness, except where spots on the river, as high up as Tanguescutack, had been intruded upon and improved by bold spirits before the purchase, and who were protected in consequence of " *their resolute stand and sufferings* during the late war," by the 8th section of the act of the 21st December, 1784; Dunlop, 98. The absurdity of dotting off seven miles for each district on a crooked river, as if it was a straight line, from the Lycoming creek to the cherry tree, a distance by water at least one-third more than a straight line, was soon manifest; and we find on the minutes of the executive council, that two of the deputies, (William Montgomery, jun., who was commissioned for district No. 4, and John Hoge, for district No. 3, men of intelligence and integrity,) presented a petition for a survey from the mouth of Pine creek to the canoe place (cherry tree). They were ordered to make the survey, giving notice to the other deputies who might choose to attend,

and, upon such measurement, divide that part of the country into ten districts. And the executive council resolved, *that this proceeding should not affect any surveys already made.* I have not been able to find that this order was ever carried into effect. But in 1792, the eighteen districts were thrown into six by the surveyor-general.

Wager, the defendant below and plaintiff in error, gave in evidence a warrant to Thomas Bowde, No. 260, of the 17th May, 1785, and a survey on this warrant in district No. 6, by John Broadhead, deputy surveyor, in July, 1793. The defendants claimed under warrants to Timothy Pickering, of the 17th May, 1785, and surveys made on these warrants in October, 1785, by James Johnston, who was the deputy of No. 13, of the first allotment. I find, on looking into the surveyor-general's office, that the Pickering surveys were returned and accepted on the 21st of March, 1786. Broadhead was not one of the first sixteen deputies. The land-office shows that Pickering's surveys were returned and accepted more than six years before Wager's surveys were made on the ground. The material question in this case embraces the whole territory of the eighteen districts, and arises on the court's instruction to the jury in answering the plaintiff's second point and the defendant's fourth point. They both substantially embrace the same question.

. The plaintiff asked the court to instruct the jury, "that if they believed the surveys of Pickering & Co., made on warrants No. 349, 251, and 371, were made west of the boundary of Johnston's district, they were made out of the jurisdiction of Johnston, and therefore void, and it was the duty of the deputy to know the boundary of his district, and not go over the same; and if he did go over the same ignorantly, his acts are equally void, though the line may not have been run." This point the court answered in the affirmative.

By the fourth point of the defendants the court were requested to charge the jury, "that the district line between Hamilton and Johnston's district, not being run and marked on the ground in this part of the country, before the location and survey of the Pickering warrant, such location and survey gives good title to the lands therein included, although not located in what was designated as the district of the deputy who made and returned the surveys." To this the court answered: "We do not assent to this; it was the duty of the deputy surveyor to define the boundaries of his district; and if he did not do so, and located a warrant on land that was not

in the district, such surveys are void; and whether Mr. Johnston, at the time of making the survey, knew the fact of their not being within his district, would make no difference." When the fact is indubitable, that but few (if any) of the lines were run from the river and the purchase line to the New York line, and that each deputy had a commission for seven miles in width, or believed he had, and when run accurately, in many places, owing to the bends and courses of the river, he might have less than three miles in width back from the river, it shows the wisdom of the application of Montgomery and Hoge to the executive council, and the wisdom of the change by the surveyor-general in 1792, in reducing the eighteen districts to six.

It is contended that the case of Prout v. Bard establishes the doctrine the defendant in error contends for, and supports the opinion of the learned judge of the Common Pleas. We agree that it establishes, that where the deputy surveyors had their districts run out and marked, they were confined to their respective districts. But it does not establish a case like the present, where the whole interior of the sixteen districts was a perfect wilderness, without improvement or a single line run or marked on the ground, and where all the lines were ideal, without a single call, except a certain distance on a crooked river. To run these paper lines and fix what was and what was not within the respective boundaries of the sixteen districts, which the government changed as soon as they discovered their folly, and at the same time declaring the change should not affect any surveys already made, would now be wrong. To attempt to establish the boundaries of the sixteen districts, at this day, by parol evidence, would be taking one man's land and giving it to another, with many valuable improvements, unless he might be protected by the statute of limitation. Time gives stability to title to real estate; on this the prosperity of the Commonwealth much depends. To make a line now, by parol, between Hamilton and Johnston's districts, would be destructive of vested rights and of legal principles heretofore held sacred. We hold the law to be, that where the district lines were not originally run and designated on the ground, one shall not now be made, which will disturb a survey more than sixty years old, and, as in this case, located, made and returned more than six years before the junior survey had existence. Such a survey is not to be disturbed by now fixing, by parol, a boundary between Hamilton and Johnston's districts. Nor is this principle new; for in Goddart v. Glonninger, it was held, that a survey made by a deputy, before the lines of the district were run, of land re-

ported to be in his district, will not be considered void forty years afterwards, when it is discovered by more careful examination, that there was a mistake as to the lines of the district. 5 Watts, 209.

The bills of exceptions to the evidence are so imperfectly returned, that it is difficult to give an opinion upon them. It may be well, however, to say, that the diagram of the districts obtained from the surveyor-general's office, if an entire copy, was evidence; so was the certificate of the appointment of James Johnston as deputy surveyor. Why the tax books and receipts for taxes were rejected, I am at a loss to understand. When proved, they are always received in evidence for what they are worth.

Judgment reversed, and a *venire facias de novo* awarded.