### Lessee of JESSE FUNSTON *against* JOHN M'MAHON.

A return of survey at least, is necessary to vest an equitable interest in lands, different from those described in the application. A survey made by a person not regularly deputed, on which a patent afterwards issues, may be read in evidence. Original notes of a survey found amongst the official papers of the deputy surveyor, may be read in evidence. But an indorsement thereon, that it belonged to the surveyor, or his declarations that he had made no actual survey, shall not be given in evidence to affect bona fide purchasers who do not claim under him.

EJECTMENT for 94 acres of land in Chillesquaque township. Defence taken for 65 acres.

The plaintiff claimed under two applications, entered on 3d April, 1769, one in the name off Jane Houston, and the other in the name of Thomas Dwyer for 300 acres of land each ; on the former thereof, a survey was said to have been made on the 6th June 1771, by William Scull, deputy surveyor, of 214 acres and 106 perches, and allowance, and on the latter, on the day following of 188 acres and 4 perches and allowance, but it did not appear, how or when the drafts of survey were returned into the surveyor general's office.

It was admitted by an agreement of counsel, that deeds had been duly executed by the said Houston and Dwyer to William Augustus Patterson, who mortgaged the premises to John Cox ; and such proceedings were afterwards had thereon, that on the 29th November 1793, Flavel Rowan, esq., sheriff of Northumberland county, conveyed the same to the lessor of the plaintiff for 17*l.*

The defendant claimed under an application entered on 3d April 1769, in the name of James M'Mahon, for 300 acres of land, a survey thereon by Jonathan Lodge of 208 acres and allowance, on the 18th July 1782, a conveyance by the said James to the defendant on 1st February, 1790, in consideration of 30*l.* : a warrant of acceptance of the survey dated 20th February 1790, which was returned accordingly on the 23d February and a patent thereon to the defendant on the following day, in consideration of 29*l.* 13s.

It was agreed on both sides, that all the several applications designated other lands, and were indescriptive of the object in controversy.

The lessor of the plaintiff purchased the lands openly, during the continuance of a court in Sunbury, at the sheriff's vendue, and many bidders attended. But it was sworn by a witness, that when Dwyer's right was knocked down to him at 11*l.*, on being told that it interfered with the claim of one John Alexander, he said he would have no dispute with him, if he would indemnify him against the sheriff ; and further, that on his desiring the witness to buy he right of Houston, he was told, that as he designed to give the titles to the possessors of the lands, the witness declined bidding against him, and thereupon the location

was struck off to him at 6*l*. The lands were proved to be worth 20 dollars per acre, exclusive of the improvements, which were considerable.

Alexander, shortly after the sheriff's sale, offered to the lessor of the plaintiff, to indemnify him against the sheriff, but the other refused, unless he was allowed to retain 100 acres of the land. He afterwards compromised with him, and accepted between 60 and 70 acres thereof. The defendant on finding that part of his tract was claimed by him, offered to submit to referees mutually chosen between them, what he should pay for his bargain; but this proposal was also rejected.

It further appeared in evidence, that two of the corner trees were marked, and on being blocked, corresponded in point of growth with the surveys said to have been made in 1771. Two other marked trees were the corners of an adjoining survey made in 1769. Two of the longest lines measuring 454 perches, appeared not to have been run or marked, but other lines of about 130 perches appeared to be marked.

In the course of the trial, the survey made for the defendant, by Jonathan Lodge, was offered in evidence, and excepted to, on the ground of his being no deputy surveyor. But it appearing that this survey had been adopted by the warrant of acceptance and patent, the objection was relinquished by the plaintiff's counsel, under a declaration that the operation thereof should be open to argument.

The defendant also proffered in evidence, the original notes of the said Jonathan Lodge, in his hand-writing, with a map of these lands said to have been surveyed without date, found amongst the land papers of the deputy surveyor of the district, indorsed thus, " Berks County, William Patterson's and Jonathan Lodge's draft, containing 403 acres and allowances ;" which were objected to, because it appeared to be the mere notes of a pretended survey by a private person ; and the indorsement thereon by Lodge, that he was interested therein with Patterson, can have no effect against a *bonâ fide* purchaser at a sheriff's vendue, where returns of survey appear to have been made in the names of Houston and Dweyer.

*Sed per curiam.* This is more than a mere memorandum by a private person. It was found amongst the official papers of the deputy surveyor, and such notes have been read in illustration of surveys. The same thing took place as to Jesse Luken's field notes, where two lines only were run, in the case of Hubley's lessee *v.* White, et al. But the indorsement thereon, that the lands belonged to Pat-

terson and Lodge, is no evidence thereof, as the plaintiff does not claim under Lodge, and his indorsement cannot affect strangers.

The declarations of the said Jonathan Lodge, were also proposed in evidence, that he had made no actual survey of the plaintiff's two locations. But the court said, that however the fact might be, the objection hereto was equally valid, as to the indorsement.

The evidence being closed, the defendant's counsel insisted, that though by the usage of the proprietary land office before the revolution, a deputy survivor might shift a lost location to other lands, where there was no prior right, yet no contract took place as to the lands surveyed between the proprietaries and the individual, until the time of issuing the warrant of acceptance. Then the title first commenced the original contract having been for other lands. There is no similitude between this case and that of removing warrants, where the money has been paid, either in whole or in part, before the warrants issued. Here nothing has been paid to the late proprietaries or the commonwealth by the lessor of the plaintiff, in order to raise an use, and the owners of the soil could not compel the payment of the purchase money under such circumstances. The defendant has the legal title from the state, and besides having paid 30*l.* to James M'Mahon, and 29*l.* 13*s.* the purchase money, to the commonwealth, is possessed of the superadded equity, of having made many valuable improvements.

But in fact, there has been no survey made on Houston's and Dweyer's applications; and it will not be pretended, that the protraction of a draft in a room from adjoining surveys, will shift these lost locations. An actual survey on the ground, like the ancient ceremony of twig and turf on the land, would be a matter of notoriety, and he considered as notice to all the world. Taking the evidence in the most favorable light for the plaintiff, the length of lines run, is only 130 perches, and we well know, that the whole country was then filed with lines of mere exploration.

There has been a gross inadequacy in the price paid by the lessor of the plaintiff. The lands are proved to be worth 7*l.* 10*s.* per acre, and he bought both tracts for 17*l.* This only can be accounted for, on the ground that the general idea was, that the purchaser would not disturb or injure the possessors. This is not bare conjecture. The fact has been proved, that Funston bought in trust for Alexander, and the other cultivators of the soil, on the condition of their indemnification. This

has been proffered, as well as the most reasonable terms, but all have been rejected.

*E contra* for the plaintiff. It has been admitted by the defendant, that his title first began with the warrant of acceptance, on the 20th February 1790. If the plaintiff's title is earlier and better, it ought to be preferred. The general practice of all the deputy surveyors, in shifting lost locations, is perfectly familiar to the whole country, and was never questioned before the revolution. If no private person could claim any right or interest in the lands so surveyed, there could be no pretext of injury or hardship done to any individual and the proprietaries attained their object, by disposing of their lands. But it was necessary there should be a return thereof made into the surveyor general's office, to operate as constructive notice to other applicants. For if one ignorant of the survey made, should apply for the same lands, and obtain a survey, before the former was returned, the latter would be entitled to a preference. Many valuable titles in this state, depend on these grounds, which it would be dangerous to impeach. The return of a survey fairly made by a deputy surveyor, into the surveyor general's office, is *ipso facto* an acceptance thereof unless a contrary intent is expressed at the time. It becomes the duty of the proper officer to examine the returns immediately, and if the dissent therefrom can be deferred for a length of time, why may it not be deferred for thirty or forty years, after making the most valuable improvements thereon?

There can be no real difference between warrants and applications shifted. When a survey is made under the former, on different lands from those designated therein, a warrant of acceptance is there also necessary. It may there with equal propriety be said, that the first contract was for other lands. Yet the surveys made both on warrants and applications shall be presumed to be with the consent of the party, unless the contrary be shown; and indeed in most instances, they are directed either by him or his agent. Hence on the return of surveys either on a warrant or location varied, a new contract for those lands, may fairly be said to be agreed upon by the proprietaries and the individual, the deputy of the former having made the survey, subject to the approbation of his constituents. It is of no moment, that a patentee has paid the consideration money, if he was not equitably and fairly entitled to the preference. In such a case, he has been often declared to stand as a trustee for the person having the earlier and better right,

though he clams under a mere application and survey, without having paid any part of the purchase money.

We fully agree, that a chamber survey cannot remove a lost location from the lands specified therein. In Houston's survey, there are lines regularly marked, and two corner trees agreeing with the surveys in 1771. To conjecture that these were mere exploration lines, would be assertion instead of proof. If William Scull has made his surveys in a negligent or slovenly manner, and has not marked all his lines, an innocent party ought not to be injured by the conduct of the proprietary deputy, acting for his principal and under his sole control. It is said that Scull died in 1783, and most probably the surveys were returned by him in his life-time.

Mere inadequacy of price is no just ground for rescinding a fair and honest contract. This must be peculiarly the case as to sheriff's sales. For who will bid thereat, if the validity of his purchaser is to be measured by the goodness of his bargain? It is scarcely credible, that the lessor of the plaintiff would bestow his labor and pains in buying lands, purely for the sake of an indemnification.

M'Kean, C. J. gave it in charge to the jury, that the plaintiff made pretensions to the land in question, on two removed applications, without showing how or when the surveys were returned into the surveyor general's office, without ever having been in possession of any part thereof, and without having paid one shilling of the consideration money. It was incumbent on him to have shown at least when the surveys were returned, if he claims under the usage spoken of. By the admission of the counsel, we are precluded from the sight of the deeds from Houston and Dwyer, and Patterson's mortgage. On an inspection of these papers, it might be known whether, at their several dates, the · plaintiff's surveys were made or returned.

It would seem however, that something more is necessary, than the mere return of survey on a shifted application to vest an equitable interest. The bare act of the deputy surveyor alone could not give a title, by surveying lands on a spot not called for the order. Until a patent issues, there is no complete legal right, and then the patent refers back to the previous application or warrant. The defendant is possessed of this patent and has paid a large consideration therefore, and has made many valuable improvements without any knowledge of the plaintiff's claim. Though Lodge was not a regular deputy, yet the survey made by him in 1782, was adopted by the owners of the soil, by their warrant of acceptance and patent. And if the

lessor of the plaintiff prevented other persons from purchasing at the sheriff's sale, by declaring that he would not injure those in possession he is bound to carry his engagement into full execution, on receiving an indemnification.

Yeates, J. subjoined.   We lay down no general rule on this subject. Several suspicious circumstances attend the plaintiff's surveys, and it is highly dubious, whether they were actually made on the ground. Two of the longest lines were not run.   It is admitted by the plaintiff's counsel, that a chamber survey cannot vary the description in the application, and that the real survey must be returned into the office of the surveyor general.   The time when these surveys were returned, becomes important to the true decision, and it lay on the plaintiff to show it satisfactorily.   Unless there has been an actual survey by Scull, and that too returned before the defendant's warrant of acceptance, the plaintiff is not entitled to recover.   I agree, that there must be something more than an actual survey by the deputy, to vest the equitable interest on a removed application.   But it rather appeared to me, that the return of such a survey fairly and duly made, is *prima facie* evidence of its acceptance by the proper authority.   If Funston bought as the trustee of those in possession, there is an end of this business, on his being made fully whole.

Verdict for the defendant, subject to his re-payment of 6*l.* to the lessor of the plaintiff, which was agreed to at the bar, by the defendant's counsel.

Messrs. Clymer and Duncan, *pro quer.*
Messrs. Ingersoll and D. Smith, *pro def.*