# Caul *against* Spring.

It is not essential to the validity of a survey, in all cases, that the deputy surveyor should have gone upon the ground to execute the warrant; if the land be bounded on three sides by the lines of older surveys, made by legal authority, and those lines returned in execution of the warrant, it is sufficient.

Upon proof of a warrant, return of survey, and patent for land, accompanied by evidence of acts of ownership for more than twenty years, during which time there was no adverse claimant, every thing will be presumed to have been rightly done, in order to support the title of the warrantee.

ERROR to *Northumberland* county.

This was an action of ejectment by Jacob Spring against Dennis Caul and others.    The plaintiff gave in evidence a warrant of 25th of April 1793 to Ezekiel King; a survey of the 12th of March 1794, returned the 30th of April 1794; and a patent of the 3d of May 1794 to John Nicholson, who had purchased King's warrant ; a sale by the treasurer for taxes in 1824 to the commissioners, and a sale by

[Caul v. Spring.]

the commissioners to the plaintiff in 1831. The defendant claimed under a warrant of the 19th of October 1814 to Samuel Stedman; a survey of the 16th of March 1815; a sale of the land as the property of Stedman by the sheriff, who conveyed to the defendants on the 30th of November 1825. The defendants then called Thomas Smith to prove that the survey on the plaintiff's warrant had not been made upon the ground, but that he had been employed by J. J. Wallace, the deputy surveyor, to make the draft for return, and that he had made them and they were certified and signed by J. J. Wallace in Philadelphia: he said that he made the draft from a connected draft given to him by J. J. Wallace. The plaintiff then gave evidence, that the lines of the survey returned were actually marked upon the ground on three sides by the authority of older warrants executed by the deputy surveyor. The question which arose was, whether this was a good execution of the warrant? The court below (Lewis, president) was of opinion that the plaintiff was entitled to recover, under all the circumstances of the case, and so instructed the jury, who found a verdict accordingly.

*Bellas* and *Hepburn*, for plaintiff in error, cited, Act of the 8th April 1785, 2 *Smith's Laws* 163; Woods *v.* Dallas, 1 *Binn.* 146; M'Dowell *v.* Ingersoll, 5 *Serg. & Rawle* 101; Lilly *v.* Kitzmiller, 1 *Yeates* 29; Lilly *v.* Executors of Pachal, 2 *Serg. & Rawle* 400; Fugate *v.* Coxe, 4 *Serg. & Rawle* 293; Weidman *v.* Feenly, 6 *Binn.* 39; Phillips *v.* Shaffer, 5 *Serg. & Rawle* 215; Morris *v.* Travis, 7 *Serg. & Rawle* 220; Bailey *v.* Snyder, 13 *Serg. & Rawle* 116; Acre *v.* Gilbert, 3 *Penns. Rep.* 307.

*Donnel*, for defendant in error, whom the court declined to hear.

The opinion of the Court was delivered by

ROGERS, J.—This is an action of ejectment to recover a tract of land in Chilisquaque township. The plaintiff gave in evidence an application dated the 24th of March 1793 for a tract of land in the name of Ezekiel King; a warrant dated the 25th of April 1793 to Ezekiel King for four hundred acres. On this a survey was made the 25th of April 1793 for four hundred and one and three-fourths acres. The survey was returned for patenting on the 30th of April 1794. The 3d of May 1794, a patent which recites a deed for Ezekiel King, was granted to John Nicholson. The plaintiff then gave in evidence the assessment book of unseated lands, in which it appeared that the land had been assessed for taxes from 1803 until 1824; the treasurer's sale book, and property sold to the commissioners of Northumberland for 21 dollars 61 cents, and a deed dated the 16th of August 1824, George Wiser, treasurer, to the commissioners of said county. The plaintiff then gave in evidence the commissioners' sale book for 1831: "sold the property in the name of Ezekiel King to Jacob Spring for 69 dollars." It was then admitted that the pro-

perty had been regularly advertised for sale by the commissioners in two papers, &c. The plaintiff then gave in evidence a deed dated the 20th of June 1831 : "Commissioners of Northumberland county to Jacob Spring, for the consideration of 69 dollars."

The defendant gave in evidence a warrant dated the 19th of October 1814 to Samuel Stedman for one hundred and eighty acres ; a survey thereon dated the 16th of March 1815 ; a judgment on a transcript from a justice of the peace, entered the 3d of March 1825, Peter Weiser *v.* Samuel Stedman ; *fieri facias,* levy on land, *venditioni exponas* to November term 1825, and lands sold to J. C. Caul for 10 dollars. The 30th of November 1825, Martin Weaver, sheriff, gave a deed for the land in dispute to John C. Caul, describing it as a tract of woodland. The defendant then examined Thomas Smith as a witness, who testified as follows.

" I was in Philadelphia in part of February, all March, and a few days in April 1794. William P. Brady and Joseph J. Wallace were both there, and lodged at the White Horse tavern, where I did. Wallace, Hamilton and Brady were all present ; they were all concerned in asking me whether I could make a diagram from the old surveys along the Northumberland branch and Chilisquaque creek, of Montour's Ridge, and cut it up into surveys of four hundred acres each. I was furnished with the surveys. Mr Wallace was backwards and forwards while I was proceeding. I made out a diagram of the mountain, and cut it up into four hundred acre tracts, some more, some less; cannot remember the number of tracts it made. Ezekiel King's was the leading warrant of these tracts I thus made. They appeared satisfied with the work; they said so. I made out different drafts, wrote the certificates, and Joseph J. Wallace signed his name to them, and paid me for the work. I had never been upon the ground. This is the draft (shown a draft) that I made out at that time. From this draft I made the separate drafts for return of survey. I was requested by Wallace to make the new surveys, and have some one of the old surveys to join. I never stretched a chain or set a compass; never was on the land at that time. The land office was in Philadelphia in 1794. This note on the large draft is in my handwriting. 'Warrants dated the 25th of April 1793 ; surveyed the 12th, 13th and 14th of March 1794.' I made the note at the time. Never saw the draft since until now ; I made another, but never saw it since either. Another note on the draft ' containing Major Jackson's seventeen tracts on Montour's Ridge.' I never made any surveys for Joseph J. Wallace before that time ; I don't know who did Wallace's work in the woods. In 1794, Mr Donnel and Mr Wilson were with me surveying on the west branch. It was in March I did this work in Philadelphia ; I cannot tell the day any further than I see it marked on the draft. I made them all out and gave them to him (Wallace); he signed some or all; but I cannot tell whether he signed Ezekiel King's or not. Wallace paid me for making the tracts out.

[Caul v. Spring.]

"When I have old surveys all around, I cannot make a mistake in laying down the new surveys. They will not interfere if the old lines be adopted."

The defendant then proved, by Thomas Woodside, a surveyor, that he received the draft spoken of by witness, from William P. Brady, and that it has been with him ever since.

The plaintiff then gave in evidence an application, dated 24th March 1793, for Ezekiel King.

William Laird was then examined, who testified as follows:

"I am deputy surveyor; I have been on, and explored the lines of Ezekiel King. On the 3d of May 1831, I began at a hickory corner of King and Boyd. There were two: a black oak tree, and a pointer to the hickory, No. 1 and 2. It bears two marks of different dates, this tree does: No. 1 counts forty-eight years, up to the 3d of May 1831; No. 2, thirty-five or thirty-six years. Thence by Abner Barton, south seventy-four east, found a tree two perches north of the line. White-oak blocks, No. 3 and 4: No. 3, eighteen or nineteen years; No. 4, forty-eight years. At one hundred and eleven perches there was a fallen white oak. Thence north forty-eight east forty-four perches to a black oak. Examined on both sides of line for marks: found one chestnut oak, No. 7, blocked, forty or forty-one years old, &c. The whole distance of the line, between King and Loke, would have carried me across Chilisquaque creek, &c."

The court charged the jury, "that the survey of Ezekiel King is bounded on all sides, except one line, by the lines of other and older surveys. These lines appear to have been regularly run, and marked, and the marks are still on the ground. A block is also produced, corresponding with the date of the plaintiff's survey. When the lines of other surveys are adopted, it is not necessary to mark them again, nor, indeed, is it proper that they should be marked again. The lines of the older survey were adopted: the survey is sufficiently established under the circumstances of this case. After this survey was returned and patented, a period of more than twenty years elapsed before the survey of defendants was made. After such a lapse of time, the presumption that all was rightly done is violent. The return of survey, the patent, and the lapse of time entitle the plaintiff to a verdict. Upon the whole evidence given he is, in law, entitled to recover."

The plaintiff in error contends that the court erred in charging the jury that "the return of the plaintiff's survey, the patent, and the lapse of time, entitle the plaintiff, in this case, to a verdict. Upon the whole evidence given, he is entitled to recover."

"If the lines of the older surveys were adopted, the survey is sufficiently established, under the circumstances of this case."

It is supposed, by the counsel for the plaintiff in error, that the court has charged the jury, that even if the survey were confessedly a chamber survey, yet if the lines of older surveys were regularly run and marked, and the marks still on the ground, and the

lines of these older surveys were adopted, it would be a valid survey. I do not think that the charge of the court, if fairly viewed, will admit of this construction. The court enumerate the circumstances which attended the case, and among others, the fact that older surveys had been made, which were well marked on the ground, as a prominent one ; and then instruct the jury, that from this and the other facts given in evidence, the plaintiff is entitled to recover. But, conceding that the court has given this direction, we will examine whether they are in error. The counsel for the plaintiff in error contends, that it is necessary to the validity of a survey, that the survey shall be made by actually going upon and measuring the land, and marking the lines to be returned upon the warrant. And for this position, they rely upon the instructions given by the proprietaries to the deputy surveyors; act of the 8th of April 1785, sec. 9, 2 *Smith's Laws* 163 ; and the repeated recognition of the principle in the cases cited. As a general principle, it is conceded that a survey must be made in the manner therein indicated, by going on the land, and marking the lines of the survey on the ground. It is obvious that the object of the legislature was, to have the lines of the tract about to be appropriated distinctly marked, in order that settlers might distinguish the appropriated from the vacant land of the commonwealth. The fact of the deputy surveyor going on the land is nothing, except so far as it is difficult to conceive how he could mark the lines, in ordinary cases, without going on the land. In all cases, except such as the present, this would be required from the necessity of the thing. The argument of the counsel amounts to this ; that however well informed the deputy may be, even if he made other surveys the day before, all of which were well marked, he must again go on the ground : or, otherwise, the surveys partake of the character of a chamber survey, and are void. I cannot believe that the law requires any such idle ceremony. In M'Rhea *v.* Plumer, 1 *Binn.* 227, it is decided, that if a survey has been made under *legal authority*, and the land surveyed remains open to purchasers, a warrant coming *afterwards* to the hands of the deputy, may be applied by him to the survey already made, without running and marking the lines anew. The ninth section of the act of the 8th of April 1785 is considered directory; and although the survey was in fact made before the warrant came to the hands of the deputy, yet the adoption of the old lines made it a new and valid survey. Chief Justice Tilghman says, "Suppose a surveyor receives a warrant, and the land to be surveyed on it is bounded on three sides by the lines of other tracts which he has surveyed *before*. It is not contended he is obliged to run those lines over again ; *and why ?* because it would be useless trouble, those lines having been run and marked by *legal authority* before ; and yet he does not comply with the words of the act, which require him to run the lines and mark them after the warrant comes to his hand." Here, then, is an implied exception from the words, to comply with the spirit of the act. In that

[Caul v. Spring.]

case, Justice Brackenridge, who dissented, admitted that an omission to go on the ground and mark the lines, would not avoid the survey. The case which the chief justice supposes as an admitted principle in illustration, is very apposite. Here the survey is bounded on three sides by older surveys, and that, he says, dispenses with the necessity of running the lines again. Again, in Covert et al. *v.* Irwin, 3 *Serg. & Rawle* 288, it is ruled, that when a new survey is made, calling for the lines of an old survey, there is no occasion to mark the lines anew. There is not only no occasion for it, but it is obviously improper; as double marks are apt to make confusion, and the new survey is as well identified by referring to the old lines as if each boundary tree was marked over again. It has been correctly remarked, that in Covert *v.* Irwin the question whether a new survey was actually made on the ground, was submitted as a fact to be decided by a jury. In most of the cases, perhaps in all, the surveyor was actually on the ground, and it is not pretended, therefore, that they are exactly in point. But still it is contended, and we accede to the correctness of the position, that the reason is the same. It must, however, be distinctly understood, that the survey must be made, *under legal authority*; for an unauthorised survey would not be sufficient. A survey, made under legal authority, is presumed to be correctly made, and I cannot perceive what mischief can arise from permitting the deputy surveyor to adopt lines, perhaps surveyed and marked on the ground by himself, on competent authority. It is in vain, as is well remarked in M'Rhea *v.* Plumer, for any man to seek for proper information by hunting for marks on the ground, without applying to the deputy surveyor, who is obliged to keep books for the purpose of information. The marks on the ground give no satisfaction; for they may have been made by unauthorised persons. But the surveyor's books, combined with the marks on the ground, will make every thing clear. The entries on the books of the surveyor would have shown that *this* land had been appropriated; and any difficulties, and I can anticipate none, would have been explained by the surveyor, on application to him. Every prudent and honest man would naturally make such an application before he expended his time, labour and money in making a settlement, or paid his money to the commonwealth as for vacant land. In this case the surveys, the lines of which were adopted by the surveyor, were made by competent authority; they are bounded on three sides by lines of older surveys, made on the ground, and well marked, and we are of the opinion that it is a good and valid survey.

But the plaintiff in error further contends that the court erred in charging the jury that the return of the plaintiff's survey, the patent, and the lapse of time, entitle the plaintiff to a verdict. It is obvious that if we are right in the preceding remarks, the court were correct in ruling " that upon the whole evidence given the plaintiff is entitled to recover." So, also, if the plaintiff had rested his case on the deed

[Caul v. Spring.]

of the 16th April 1824, and the deed of the 20th January 1831—the commissioners of Northumberland county to him—it is difficult to imagine how the defendant could resist the plaintiff's title. It is a sale of unseated land for taxes, which, of course, vests the title, where regularly made, in the vendee, to the exclusion of all claimants to the land of a prior date. In addition to this, after the survey was returned and patented, a period of more than twenty years elapsed before the survey of the defendant was made. Surely, after such a lapse of time, the court were not wrong in directing " that the presumption that all was rightly done is violent." The return of survey is of itself a presumption that a survey was made on the ground : this presumption increases by time, and after a period of twenty years from the return of survey, when the warrantee has exercised acts of ownership over it, by payment of taxes, &c., it should require omnipotent proof to rebut it. It is unnecessary to decide that, after such a lapse of time, a *præsumptio juris de jure* arises. In relation to this point, in Moot v. Astley, Justice Duncan uses this language : " If it appears by marks on the ground, marks sufficient to show the land, and the survey is returned, *omnia præsumuntur rite acta;* and when the return has lain for years in the office undisturbed, without any opposing claim or possession, more particularly when the owner has paid the public taxes, the presumption is a violent one, and so ought always to be left to the jury, of the survey being a regular one, though all the marked lines are not at a distant day to be found on the ground ; *and after twenty-one years, by analogy to all presumptions, for myself and as my opinion, I would consider it a presumption of law, and, like livery of seisin, it ought to be presumed.*" This opinion of Justice Duncan has my hearty concurrence. The time has arrived when the adoption of this principle would be productive of great public good. Analogies might be multiplied without end ; but the cases, and they are innumerable, are well known to the profession, I shall therefore be excused from giving a detailed statement of them. Some of them have been cited on the argument. The following authorities decided in our courts, have a strong bearing on this part of the case. 3 *Serg. & Rawle* 490 ; 10 *Serg. & Rawle* 69, 390 ; 14 *Serg. & Rawle* 19, 21 ; 17 *Serg. & Rawle* 53 ; 17 *Serg. & Rawle* 351 ; 3 *Penns. Rep.* 117 ; 13 *Serg. & Rawle* 124 ; vide 1 *P. Williams* 270 ; 4 *Burr.* 1962 ; 10 *Johns. Rep.* 402 ; 7 *Wheat.* 109, 110. In the Winchelsea causes, which are cases of franchise, the court said it would be right to fix a certain point of *limitation,* beyond which they would not go back to disturb a possession so long acquiesced in. And having taken due time to consider how many years this quiet possession ought to have lasted in order to protect it from future impeachment, they now publicly declared the resolution they were unanimously come to ; namely, that after *twenty* years unimpeached possession of a corporate franchise, no rule ought to be granted against the person in possession to oblige him to

[Caul v. Spring.]

show by what right he holds it. So that, as the court say, there is an analogy between this and other limitations, confining the retrospect to a reasonable time. And Lord Mansfield notified the bar in the name of the whole court, that upon talking over and considering the subject, they were all clearly of opinion that twenty years was the *ne plus ultra beyond* which the court would *not disturb* a peaceable possession of a franchise ; but that every case *within* twenty years, their granting the rule, or refusing to grant it, would depend on the particular *circumstances* of the case that should be in question before them.

Presumptions from length of time, in analogy to the act of limitations, are made for the sake of peace. In Pennsylvania, at this time, it is of paramount importance that people should be quieted in their possessions. The increased value given to lands, in consequence of the discovery of its mineral wealth, has induced a spirit of speculation, which will give rise to great litigation. It is important, therefore, that those who have been in the quiet possession of land should not be disturbed, to give it to those who are only induced to lay claim to it in consequence of the change in its value.

Judgment affirmed.